S. T. COATS et al., Appellants,

v.

Wyman WINDHAM et al., Appellees.

No. 5032.

Court of Civil Appeals of Texas.

Beaumont.

June 16, 1955.

Rehearing Denied July 7, 1955.

Stewart, Burgess & Morris, Houston, V. A. Collins, Livingston, for appellants.

W. C. McClain, Conroe, Campbell & Foreman, Livingston, for appellees.

R. L. MURRAY, Chief Justice.

This is an appeal from an adverse judgment in the Special Ninth District Court of Polk County by S. T. Coats and N. A. Coats, appellants. The suit was originally brought by them as plaintiffs against Wyman Windham, E. T. Murphy, James M. Windham and Wyman Windham, Jr. Before the case was tried on its merits Wyman Windham died and Mrs. Mattie Windham, individually and as independent executrix and sole beneficiary under the will of Wyman Windham, was substituted for him as a party defendant. Thereafter the appellants, plaintiffs in the trial court, filed their second amended original petition in which the defendants were Mrs. Mattie Windham, individually and as independent executrix and sole beneficiary under the will of Wyman Windham, deceased, E. T. Murphy, Mrs. Gertrude Murphy, Dr. C. S. Murphy, James M. Windham and Wyman Windham, Jr. This was the pleading on which the appellants went to trial. During the course of the trial Dr. C. S. Murphy was dismissed as a party defendant upon motion of the appellants. He is not a party to this appeal.

Before the death of Wyman Windham the trial court heard and sustained a plea in abatement filed by Wyman Windham et al. On appeal this court reversed and rendered that judgment and ordered the case tried on its merits. Coats v. Windham, Tex.Civ. App., 254 S.W.2d 530, writ refused n. r. e.

The trial was to a jury and upon a verdict in favor of the appellees, judgment was rendered thereon that the appellants take nothing by their suit against the appellees. Motion and amended motion for new trial were filed by the appellants, a hearing was had and a large volume of testimony there-

on was heard and at the conclusion thereof the trial court overruled it and made numerous findings of fact in connection with such action. The appellants duly perfected their appeal from the judgment and order overruling their amended motion for new trial and it is before us for review.

After the formal allegations the second amended original petition of the appellants alleged in substance, as follows:

On or about June 8, 1951 S. T. Coats learned that one E. N. Sonnier was the owner of some standing timber on 8,480 acres of land in the Victor Blanco Survey in Harris County, and that said timber was for sale; being interested in the prospect of making a profit from the purchase and resale of such timber the said S. T. Coats made an agreement with one Clarence Coleman, agent for Sonnier, on August 15, 1951, by which it was agreed that S. T. Coats and his son, N. A. Coats, would have ten days in which to inspect and estimate the quantity of standing timber on the land and that Sonnier was to be paid as the sale price of such timber $225,000.

That S. T. Coats thereafter went on the land for the purpose of estimating the timber and while there Wyman Windham saw him on the land and proposed that he be taken into the deal to purchase the timber and that he could and would arrange the financing therefor; S. T. Coats did not then make any agreement with Wyman Windham but thereafter on August 22, 1951, an agreement in writing was made by S. T. Coats and N. A. Coats and Wyman Windham, by which S. T. Coats and N. A. Coats agreed to make and furnish a complete report of the estimated timber and Wyman Windham was to assist in financing the trade, and each of the three, S. T. Coats, N. A. Coats and Wyman Windham was to receive one-third of the proceeds realized from the purchase and resale of the timber and the parties were to mutually cooperate to the best interests of each other to effectuate a purchase and resale of the timber.

After S. T. Coats completed estimating the quantity of timber S. T. Coats and Clarence Coleman made an agreement with E. N. Sonnier at his office in Houston on August 23, 1951, that a trade had been made between them, and that although a deed conveying the timber would not be delivered to Coats until about three weeks that nevertheless S. T. Coats had purchased the said timber for $225,000, including a $15,000 commission to Clarence Coleman which was to be paid on delivery of the deed from Sonnier to S. T. Coats.

That thereafter the said Wyman Windham associated appellee E. T. Murphy with him in the trade to assist in financing the deal and on November 3, 1951, Wyman Windham, E. T. Murphy, James M. Windham and Wyman Windham, Jr., secured the timber deed from E. N. Sonnier, all of which was in furtherance and consummation of the deal S. T. Coats had made with E. N. Sonnier and the deal between the Coats and Wyman Windham. Such deed was filed for record in Harris County November 7, 1951.

After August 23, 1951 numerous prospective purchasers of the timber were referred to S. T. Coats, each of whom was informed that the timber was owned by S. T. Coats or by him and Wyman Windham; that S. T. Coats accompanied the prospective purchasers or their agents to the land where the timber was and showed the timber; among such prospects was Kenneth Nelson, an agent for Southern Pine Lumber Company. On or about November 14, 1951, Wyman Windham, E. T. Murphy, James M. Windham and Wyman Windham, Jr., executed a timber deed to the timber on said tract to Southern Pine Lumber Company. Said timber deed was filed for record in Harris County December 6, 1951.

That Wyman Windham, E. T. Murphy, James M. Windham and Wyman Windham, Jr., were paid the sum of $325,000 by Southern Pine Lumber Company for said timber in consummation of the sale or trade actually made as a result of the efforts of S. T. Coats, and S. T. Coats and N. A. Coats are entitled to be paid and receive two-thirds of the profit realized from such sale. That the defendants below received

all of the money realized from such sale, including the two-thirds which rightfully belongs to the appellants. They are informed and believe that the net profit realized on the trade was in excess of $85,000. That after the sale to Southern Pine Lumber Company, the money received therefor was deposited in the First National Bank of Livingston in a joint account opened in the names of Mrs. Mattie Windham and Mrs. Gertrude Murphy, or Mrs. Wyman Windham and Mrs. E. T. Murphy; that thereafter said money was paid out by check to Wyman Windham and all the appellees, including payments in amounts unknown to the appellants, but well known to the appellees, to Mrs. Gertrude Murphy, Dr. C. S. Murphy and Mrs. Mattie Windham; that the appellants' share of the profits from said trade has been appropriated and/or converted by the appellees to the damage of the appellants.

The appellants have made repeated demands of the appellees for an accounting of the money received from said sale and for their share of the profits, which demands were refused and appellees are attempting to repudiate the agreement of August 22, 1951, between Wyman Windham and S. T. Coats, of which all of said appellees had notice and knowledge as well as knowledge of their interest in the timber and the sale thereof and the profits therefrom.

They prayed that appellees be required to account to the appellants for all money received for the sale of the timber, with money and profits belonging to the appellants converted by the appellees, together with interest from November 14, 1951.

All of the original defendants in the suit filed a joint answer and the first amended original answer contained in substance the following allegations:

Except as admitted, they denied generally the allegations contained in the second amended original petition.

For special answers appellees allege in detail the execution of the written agreement of August 22, 1951, between the appellants and Wyman Windham, now deceased.

That at the time of this agreement it was contemplated by the parties thereto that in reasonable probability the timber could be bought and promptly resold to either the Texas Creosoting Company or Eden-Burch Lumber Company and that by doing so the extent of the financing would not exceed ten percent of the purchase price, which sum probably would be required to be placed in escrow as earnest money pending title examination and preparation of deeds; that neither of the parties suspected that there would be an unusual delay in the acquisition of said timber and the sale thereof and that they would be called upon to pay the full purchase price of said timber in advance of the resale.

That in pursuance to their agreement the parties began their negotiations to purchase the timber and attempted to obtain a buyer; that S. T. Coats talked with Texas Creosoting Company and learned that they were not interested in the purchase of the timber; that he next talked with Edens-Burch Lumber Company and again to his disappointment as well as to the disappointment of Wyman Windham it was learned that said company was not interested in the purchase of the timber; in addition to the above S. T. Coats also showed the timber to several other people, none of whom were interested in the purchase thereof. An agreement was made with Cecil Smith, L. M. Feagin, E. W. Tubb and H. E. Allinson of Woodville, by which it was agreed that S. T. Coats, N. A. Coats and Wyman Windham would sell the timber for $320,-000 as soon as they acquired a deed thereto from East Texas Oil Company, in whom the title to the timber was actually vested instead of Sonnier Construction Company or E. N. Sonnier; that for some personal reason appellants doubted that Smith and his associates would ever fulfill their agreement if appellants and Wyman Windham should ever acquire title to the timber, and in fact said parties did refuse to go through with their agreement to purchase when it was actually tendered to them. That prior to the said agreement the parties had learned that title was not in Sonnier but in East Texas Oil Company and that a

number of people were attempting to buy the timber directly from East Texas Oil Company. That from August 22, 1951 the parties had dealt with C. S. Coleman, who purported to act as agent and representative of E. N. Sonnier and from whom they expected to obtain an option for the purchase of the timber. That notwithstanding the efforts of S. T. Coats and Wyman Windham they were never able to obtain more than a verbal promise from C. S. Coleman that the timber would be conveyed to them, he never being definite as to the time for closing the sale; that neither Coleman nor Sonnier would commit themselves in writing as to the sale of the timber and when pressed for a deed it was explained that a deed could not be obtained from East Texas Oil Company at that time.

That during the meantime considerable time had been spent by the parties in connection with their venture and in addition thereto Wyman Windham had spent considerable money in the furtherance of the purchase and sale of the timber, and it was apparent as late as the latter part of September, 1951, that additional money would have to be spent in connection with said transaction without any assurance of any benefit therefrom and with a chance of a loss thereof; the parties further realized that the additional money to be required would be a very large sum and would be greatly excessive of the amount of money the parties had originally contemplated to be required to close the transaction. That it was also apparent that title to the timber was in East Texas Oil Company, that there was nothing to evidence the fact that it would ever part with the title and if so to whom they would pass title or for how much, and the parties further realized that the fact that they had been unable to obtain an option or commitment to the timber, and that all other parties desiring to purchase said timber stood on an equal footing with them so far as their right to purchase said timber was concerned, all of which was discouraging to the parties, including Wyman Windham. That it was also apparent that if the timber was acquired as planned the full purchase price would have to be paid at the time of the delivery of the deed and that said cash payment might have to be raised on short notice.

That on or about October 2, 1951, S. T. Coats, individually and acting in behalf of his son, N. A. Coats, went to the office of Wyman Windham in Livingston and in substance stated to Mr. Windham that he wanted to withdraw from their venture in the attempt to purchase and resale of the timber and that Wyman Windham and E. T. Murphy could carry on and succeed to any rights that he had or might be entitled to under the terms of the agreement of August 22, 1951; that at the instance and request of S. T. Coats, acting for himself and his son, N. A. Coats, they withdrew from the aforesaid adventure, terminating and abandoning the joint adventure which they had entered into with Wyman Windham, leaving Wyman Windham to decide to "follow suit" or to continue with the hope that he might be able to accomplish the objective originally planned, thereby recovering the money he had spent and being in position to discharge the obligations entered into by and between the Coats and Windham with third parties; that under the circumstances Wyman Windham did not object and gave his consent to the said S. T. Coats to abandon said adventure and that in all things mutually agreed to terminate the agreement of August 22, 1951.

That at the time of said withdrawal no request was made that any consideration be paid to appellants in the event Wyman Windham continued his efforts and was successful in buying and selling said timber at a profit, but said Wyman Windham voluntarily told S. T. Coats that he was going to continue and that if and when the timber was bought and sold for a profit Wyman Windham would pay S. T. Coats and N. A. Coats $5,000 to compensate them for the timber estimate and time spent up to October 2, 1951 and that he then assumed the $15,000 note dated September 4, 1951, payable to C. S. Coleman and signed by S. T. Coats and Wyman Windham; that he would further comply with the contract made with Cecil Smith and his associates

dated September 20, 1951; that S. T. Coats, individually and in behalf of his son and partner, N. A. Coats, accepted said proposition and termination agreement in lieu and in substitution of any and all other agreements theretofore made between S. T. Coats, N. A. Coats, Wyman Windham and E. T. Murphy and particularly the agreement of August 22, 1951. That following the above agreement and on the same date, thereof the parties went to the home of C. S. Coleman in Montgomery County and related to him such agreement, and following which, in the presence of and with the consent of S. T. Coats, Wyman Windham and C. S. Coleman a letter was written at the request of C. S. Coleman to E. N. Sonnier; in this letter Mr. Coleman advised Mr. Sonnier that he had sold to Wyman Windham and E. T. Murphy certain specified sizes of timber on the land in Harris County.

That after October 2, 1951, S. T. Coats and N. A. Coats, by word of mouth and by their actions ratified and confirmed their withdrawal and abandonment of their attempted purchase and sale of said timber and that after October 2, 1951, so far as is known by the appellees neither of the appellants did anything in the furtherance of the purchase and sale of the timber; that they devoted no more time thereto, spent no money thereon, and never expressed to the appellees or to Wyman Windham or to anyone in their presence an intention of receiving any monies other than the said $5,000 that might be derived as a profit from the purchase and sale of the timber, if and when it ever materialized.

That following October 2, 1951, Wyman Windham and E. T. Murphy jointly continued their efforts to buy and sell the timber and on November 5th or 6th, 1951, they were notified that for $210,000, plus some $22,000 more, payable in cash not later than November 7, 1951, E. N. Sonnier would execute to them a deed to the timber; that with the limited time at hand Murphy and Wyman Windham pooled their cash on hand and borrowed from various banks and individuals in order to raise the proper amount of money required to acquire a deed to the timber; that in borrowing said money

they were required to pledge and mortgage properties belonging to them and their wives as security. That the deed was delivered then to them on or about November 7, 1951, in which E. T. Murphy, Wyman Windham, Wyman Windham, Jr., and James M. Windham were named as grantees. Subsequently thereto Cecil Smith and his associates refused to take the timber as agreed and their contract of August 22, 1951, although the appellees were able, willing and ready to perform it in accordance with their agreement; that after Cecil Smith and his associates refused to buy the timber the timber was then sold by Wyman Windham and the other grantees under their deed from Sonnier to Southern Pine Lumber Company and a deed to said timber was delivered to it November 14, 1951, for a consideration of $325,000.

That their note for $15,000, payable to C. S. Coleman, has been paid and they have at all times been able, ready and willing to pay to S. T. Coats and N. A. Coats the sum of $5,000 and have offered to pay it, but for some reason unknown to the appellees the appellants failed and refused to accept it, but insist that they are entitled to two-thirds of the profit derived from the sale of said timber. Appellees tendered into the registry of the court for the use and benefit of the appellants $5,000.

The appellants filed thereafter their first supplemental petition in reply to such allegations and therein denied generally all the allegations in the first amended original answer. They further denied specially the allegation that they doubted that Cecil Smith and his associates would fulfill their contract to buy the timber. They further specially denied that they ever withdrew or offered to withdraw from the joint adventure as alleged.

They alleged that on or about September 20, 1951 S. T. Coats, N. A. Coats, E. T. Murphy and Wyman Windham made a written contract with Cecil Smith and his associates for the sale of the timber for $320,000; that having previously entered into an agreement to purchase the timber from Sonnier for $225,000 they confidently

anticipated a gross profit on the sale of the timber to Smith and his associates of $95,000. That after September 20, 1951, the appellants had no negotiations with Arthur Temple or the Southern Pine Lumber Company and were unaware that E. T. Murphy or Wyman Windham had dealt with them or either of them after September 20, 1951, nor suspected that they had granted an option to Temple or the Southern Pine Lumber Company in violation of their written agreement to sell said timber to Cecil Smith and his associates and for the appellants or either of them to withdraw, abandon or retire from the venture after the contract made with Cecil Smith and his associates would have been absolute folly and they deny such withdrawal; they further denied that Wyman Windham ever offered them $5,000 for their time in estimating the timber and that he would assume payment of the $15,000 note payable to C. S. Coleman. They alleged that the appellees paid Cecil Smith and his associates $5,000 and the conveyance of the timber was then made to Southern Pine Lumber Company instead of to Cecil Smith. They further alleged that after appellees had completed the transaction with the Southern Pine Lumber Company Wyman Windham gave appellants a written statement of the transaction, which statement shows that said Wyman Windham recognized that they were entitled to an undivided interest in the profits, but such statement falsely and fraudulently showed that the cost of the timber was $310,000 instead of $232,000; that the said Sonnier and Coleman were paid $232,000 instead of $225,000. That said false statement made by Wyman Windham showed Coats was entitled to $3,571.25, the same being also represented by Wyman Windham to be one-half of the profits from the deal.

They further alleged that when the purchase of the timber was made from Sonnier and shortly thereafter sold to Southern Pine Lumber Company the appellants were distracted and distraught because of a sudden, unexpected and tragic death of a beloved daughter of N. A. Coats and the appellants believed and alleged that the appellees deliberately consummated the timber contract at that time with the hope that their fraudulent scheme designed to avoid payment of their share of the profits would go unchallenged and unnoticed while appellants' minds were preoccupied and their hearts heavy because of their loss.

Thereafter the appellants filed a trial amendment to the second paragraph of their supplemental petition alleging "that with regard to defendants' averments that plaintiffs withdrew from and abandoned the contract into which they had entered with Wyman Windham, dated August 22, 1951, these defendants emphatically deny that such is a fact; that, in any event, and at most, the parties plaintiff and Wyman Windham did have a discussion in regard to altering and amending the said contract so as to reduce plaintiffs' interest and portion of the profits hoped to be realized from the purchase and resale of the timber from two-thirds to fifty percent; that said transaction was merely a discussion, and it was never consummated." In said trial amendment they prayed as in their second amended original petition, and in the alternative they prayed that should it be found that they had agreed to alter and amend the contract in said respects that they recover fifty percent of the profits realized from the trade.

The jury by its verdict found in answer to its special issues that (1) on or about October 2, 1951, S. T. Coats and N. A. Coats, acting by and through S. T. Coats by mutual oral agreement with Wyman Windham withdrew from and terminated their written agreement dated August 22, 1951; (2) that S. T. Coats, acting for himself and N. A. Coats, did not agree with Wyman Windham to alter the contract of August 22, 1951, so that the profits would be apportioned fifty percent to S. T. Coats and N. A. Coats and fifty percent to Wyman Windham; (3) that S. T. Coats for himself and N. A. Coats, by his acts, conduct and conversation before November 5, 1951, did not lead defendants to believe that the August 22, 1951, contract was altered and amended so as to provide for a division of the profits—fifty percent to plaintiffs and

fifty percent to Wyman Windham; (5) that on or about October 2, 1951, S. T. Coats and N. A. Coats, acting through S. T. Coats, entered into an oral agreement with Wyman Windham whereby they mutually agreed in lieu and in substitution of their written agreement of August 22, 1951, that if and when the timber in question was purchased and sold by Wyman Windham for a profit, that Wyman Windham would pay to S. T. Coats and N. A. Coats out of said profits the sum of $5,000 to compensate them for their time spent in estimating the timber in question, and in addition thereto that he would likewise assume the $15,000 note of September 4, 1951, payable to C. S. Coleman, signed by S. T. Coats and Wyman Windham.

The appellants bring their appeal under 16 Points of Error.

The first six points of the appellants say that the trial court erred in entering judgment for the appellees, and in overruling the appellants' amended motion for new trial, because the verdict of the jury is so against the great weight and preponderance of the evidence as to be manifestly unjust, to be clearly wrong, as to clearly show that it is contaminated with bias and improper motives and is so in conflict with the justice of the case as to be unconscionable.

By their 7th and 8th points the appellants contend that the trial court erred in overruling their amended motion for new trial because it was shown that the jury reached its verdict as a result of conspiracy to deprive them of a fair and impartial trial, and because they were deprived of a trial by a fair and impartial jury, contrary to the constitutional guarantees of the United States and of Texas and to the statutory assurance of this state.

By their 9th, 10th, 11th and 12th points the appellants contend that their amended motion for a new trial was erroneously overruled because the jury commission which selected the jurors for the trial of the case was not a lawfully constituted body, that said jury commissioners acted in complete disregard of the statutes regulating and controlling their acts as such commissioners, that the jury commission was never lawfully created, that the jury to which their case was tried was illegally and unlawfully constituted and therefore the verdict was void and of no force and effect.

By their 13th, 14th, 15th and 16th points the appellants contend that the trial court erred in entering judgment for the appellees and overruling the appellants' amended motion for new trial, because even if there were sufficient evidence to support the submission of Special Issue No. 1 the appellees could not after October 2, 1951, treat the agreement of August 22, 1951, as abandonment by S. T. Coats, because the said S. T. Coats had performed all the duties and obligations imposed upon him by said agreement or was then engaged in the performance of said agreement; because the evidence relied upon by the appellees to constitute an abandonment of the contract of August 22, 1951, between S. T. Coats and Wyman Windham was not positive, unequivocal and inconsistent with the continued existence of the contract after October 2, 1951, and because the evidence is consistent with the continued existence after October 2, 1951, of the August 22, 1951, contract.

We discuss first Points 1 to 6, inclusive, which deal with the sufficiency of the evidence to support the findings of the jury, and Points number 13 to 16, inclusive, which are above summarized.

The evidence in support of the jury's verdict and judgment was as follows. In May, 1951 East Texas Oil Company owned the land in Harris County on which the timber was located. E. N. Sonnier had a grazing lease on the land but owned no other interest therein and was not an officer or stockholder of East Texas Oil Company. Sonnier entered into an agreement with C. S. Coleman by which they agreed that they would attempt to buy the timber from East Texas Oil Company and sell it at a profit. Coleman made a tentative contract to sell the timber to Grogan-Cochran Lumber Company, the sale to be completed by June 20, 1951. By that date he could not secure

a deed from East Texas Oil Company and the time of the sale was then extended to July 11th. By July 11th Sonnier and Coleman failed to secure title to the timber and this deal was abandoned. Coleman showed the timber to Wyman Windham as a prospective purchaser in July or August. After Windham began his examination of the timber he met S. T. Coats and there they discussed a possible trade together for the timber. On August 22, 1951, S. T. Coats, N. A. Coats, his son, and Wyman Windham made a written contract for the purchase and sale of said timber which read as follows:

"S. T. Coats & Son
Surveyors and Timber Estimators

Licensed Land Surveyor in Office
"S. T. Coats
N. A. Coats

Livingston, Texas
August 22, 1951.
"Mr. Wyman *Windom*
N. A. Coats
City.

"Gentlemen:
"This is to confirm our verbal agreement of this date, that in the purchase and sale of the East Texas Oil Company timber in the Victor Blanco Survey, Harris County, Texas, now owned by Sonnier Construction Co. or by Mr. Sonnier personally, we shall each have one third interest in any net profits accruing from such purchase and sale, and we agree to mutually cooperate in the best interest of such purchase and sale of said timber.

"S. T. Coats and N. A. Coats agree to furnish a complete report of the timber estimate and Wyman *Windom* agrees to assist in financing the deal to whatever extent it may become necessary in effecting transfer of title and completing the deal to a successful conclusion.

"Signed /s/ S. T. Coats
        S. T. Coats
     /s/ N. A. Coats
        N. A. Coats
     /s/ Wyman Windham
        Wyman *Windom*"

On September 4, 1951, S. T. Coats and Wyman Windham signed a note payable to C. S. Coleman for $15,000. While this instrument was in the form of a note it is really a written contract by Coats and Windham to pay Coleman $15,000 as commission in effecting the sale of the timber to them, since it was payable only in the event the sale of the timber by Sonnier to Coats and Windham was completed and was to be void in the event the sale was not completed. The parties, Coats and Windham, at the time they made the August 22, 1951, contract, believed that they could buy the timber without paying the full amount of the purchase price, but would have a sale made to Edens-Burch Lumber Company at approximately the same time of the purchase from Sonnier. Coats tried to sell the timber to Edens-Burch Lumber Company and Texas Creosoting Company but failed in both attempts. Coats and Windham hoped to get the deed from Sonnier by September 15th but by that date Sonnier still did not have title from East Texas Oil Company. On September 20, 1951, Wyman Windham, S. T. Coats, N. A. Coats and E. T. Murphy agreed in writing with Cecil Smith and associates from Woodville to sell the timber in question for $320,000. This was conditioned upon their ability to secure title from Sonnier or East Texas Oil Company. On October 1, 1951, S. T. Coats and Coleman were informed by Sonnier in Houston that Sonnier had not secured a deed from East Texas Oil Company and would not be able to for another 30 days thereafter. Coats stated at that time that he did not believe that Sonnier would be able to get a deed for the timber and that he was getting out of the deal; he told Sonnier to go ahead and deal with Windham and that he did not have the money to go through with the deal. Sonnier thereafter dealt with Windham and Murphy in the sale. On the same day in Livingston, Coleman told Wyman Windham that Coats was getting out of the deal, and wanted to know if Windham was intending to buy the timber. Windham stated that he and Judge E. T. Murphy would take it if they ever got a deed to it. Shortly thereafter S. T. Coats stated

in Wyman Windham's office that he was going to pull out of the deal; that it did not look like they were ever going to get a deed, and it looked like it was going to take more money to handle it than they thought and that he did not have the money to put in it. Wyman Windham agreed to this and said that he felt like Mr. Coats and his son ought to be paid for estimating the timber and that he would pay him for such time and would also assume the $15,000 note he and Coats had signed in favor of Coleman. Coats said he thought that was fair enough. On October 2nd Wyman Windham and S. T. Coats met Coleman at Splendora and Windham, in the presence of Coats, told Coleman that Coats was getting out of the deal, that Windham would buy the timber and pay Coleman the $15,000 note and also stated that if he made enough profit from the deal he would give Coats $5,000 for his work in estimating the timber. They then, at Coleman's suggestion, proceeded to the office of W. C. McClain, an attorney in Conroe, and had him write a letter to Sonnier for Coleman. In this letter, Coleman stated to Sonnier, "This is to advise that in pursuance to our agreement I have sold to Mr. Wyman Windham and Mr. E. T. Murphy of Livingston, Texas all of the pine timber" of certain sizes on the land in Harris County. In the preparation of the letter in Mr. McClain's office with Coleman, Coats and McClain present, a question was asked who the purchasers were, and it was stated that Windham and Murphy were the purchasers, to which Coats agreed and stated "I am out of the deal."

N. A. Coats showed the timber to representatives of Cecil Smith and associates and also to an agent for Southern Pine Lumber Company, the eventual purchaser of the timber from Windham and Murphy. The agreement by Windham, Murphy, S. T. Coats and N. A. Coats to sell the timber to Cecil Smith and associates was dated September 20, 1951. The agreement with Mr. Arthur Temple, Jr., for Southern Pine Lumber Company, was dated October 25, 1951, and was signed by Wyman Windham and E. T. Murphy.

On November 5th or 6th Windham and Murphy were notified that Sonnier was ready to execute a deed to them for the timber and that they, Windham and Murphy, were to have the full cash price of $210,000, with an added amount of approximately $22,000, ready and payable November 7, 1951. Murphy and Windham borrowed from various banks in Livingston and Houston, took the money to Houston and paid it to Sonnier on November 7, 1951. Sonnier thereupon delivered the deed to Windham and Murphy to the timber. E. T. Murphy, Wyman Windham, Wyman Windham, Jr., and James M. Windham were grantees in the deed. Thereafter Murphy and Windham paid Cecil Smith and associates $5,000 and on November 14, 1951, Murphy, Wyman Windham and the other grantees in the deed from Sonnier sold the timber to Southern Pine Lumber Company for $325,000. The $15,000 so-called note was paid to Coleman. Wyman Windham reimbursed himself for some $7,000 he had spent in promoting the purchase and sale and the net profit was divided between Murphy and the Windhams. The timber deeds from East Texas Oil Company to Sonnier and from Sonnier to Murphy and the three Windhams did not contain a general warranty clause. The timber deed from Murphy and the Windhams to Southern Pine Lumber Company did contain a general warranty clause.

We think this evidence is sufficient to support the finding of the jury that Mr. Coats withdrew from and terminated the written agreement with Wyman Windham dated August 22, 1951. The appellants argue that Coats could not have abandoned or withdrawn from the contract on October 2nd since the undisputed evidence is that the timber had been sold to Cecil Smith and associates on September 20, 1951, 13 days before the alleged date of abandonment by Coats. They say that no sane man would abandon or terminate his contract or agreement, after he had performed all the duties and obligations imposed upon him by the August 22, 1951 agreement, after the timber was sold at a large profit. They say in their brief that such an abandonment is

inconsistent with the following facts shown by the evidence:

(1) The letter of October 2, 1951, written by Mr. McClain for Coleman to Sonnier said nothing about S. T. Coats abandoning the timber trade, and was obviously written for a different purpose and was so understood by Sonnier. (2) Wyman Windham consulted S. T. Coats about Cecil Smith's letter to Windham of October 20, 1951. (3) Wyman Windham consulted S. T. Coats about Mr. Garrison's letter to Windham dated October 23, 1951. Mr. Garrison, as attorney for Southern Pine Lumber Company, by his letter notified Windham and others that Southern Pine Lumber Company was demanding a fulfillment of their contract with his client for the purchase of the timber. (4) Wyman Windham told S. T. Coats about the option given Arthur Temple, Jr., dated October 25, 1951. (5) Wyman Windham consulted S. T. Coats on November 5, 1951, showing him the timber deed from Sonnier. (6) Wyman Windham falsely told S. T. Coats on November 5, 1951, that Sonnier was demanding $100,000 under the table, increasing the price of the timber from $210,000 to $310,000. (7) Wyman Windham called S. T. Coats on November 7, 1951, and told him that a timber deed had been secured from Sonnier. (8) Wyman Windham called S. T. Coats following the sale of the timber to Southern Pine Lumber Company on November 14, 1951, to advise him of the fact. (9) Wyman Windham made the statement at a conference in James E. Wheat's office in Woodville that Sonnier had told Coats that he had been paid $210,000 for the timber: "Well, he better not say that to me." (10) Wyman Windham prepared a statement which falsely stated the cost of the timber to have been $310,000 and the total profit $7,142.50, which was to be divided one-half to Coats, one-half to Windham. (11) Wyman Windham and E. T. Murphy deposited the money representing the gross profits from the trade in a bank account opened in the names of Mrs. Mattie Windham and Mrs. Gertrude Murphy, jointly. (12) After the sale to Southern Pine Lumber Company Dr. C. S.

Murphy, a brother of Judge E. T. Murphy, was paid $18,000 plus, as his share of the profit and he backed out and gave the money to Judge Murphy. Appellants regard these facts as being of such a serious nature and so positive in their effect as to make the jury's verdict contrary to the great weight and preponderance of the evidence. We do not agree. In the first place, Mr. Coats, by his agreement of August 22, 1951, with Wyman Windham, made an agreement by which he and Windham were to combine their efforts for both the purchase and sale of this timber for a profit. The evidence shows that while he made estimates of the amount and value of the timber on the land and made efforts to sell the timber in the event it could be bought, he did nothing whatever in the actual purchase of the timber. This was a most serious problem that confronted the buyers of the timber. They were called upon to produce some $230,000 in cash within two days at most. They were called upon to buy this timber without a general warranty clause and in making a sale to Southern Pine Lumber Company they had to give a general warranty of title. If Coats had not stated that he had abandoned and terminated the August 22, 1951, agreement before this date, he is shown to have abandoned it by the fact that he did not pay any part of the purchase price, and took no part in the purchase, and was not named as a grantee in the deed.

Coats is not in the position of a real estate broker suing for a commission by virtue of the fact that he procured a buyer for a seller. In the former appeal of this case, Coats v. Windham, Tex.Civ.App., 254 S.W.2d 530, the appellees Windham et al. contended to that effect. The contention of Coats et al. there was that this was a joint adventure between him and Windham and was not a suit for broker's commission. We sustained Coats in that contention. The suit was tried on the issues joined that he and Windham had entered into a joint adventure and the answering contention of Windham et al. that if there had been a joint adventure the Coats had abandoned it.

He was thus required to satisfy the jury, triers of the facts, that he had not abandoned his contract and had fully complied therewith. He assisted and rendered some service in the matter of procuring a buyer, but this was done before any title was ever acquired to the timber which they were trying to sell.

It was not unreasonable for the jury to believe that Windham kept Coats advised about the progress of the deal after October 1, 1951, because Coats was in a position to realize a $5,000 payment from Windham for his service in making the timber estimates if the purchase and sale of the timber should be concluded at a profit. At the same time he knew that unless a purchase and sale were not made, he could expect nothing at all for his time and work in making the timber estimates.

All of the above twelve facts listed by the appellants and relied upon by them were matters which the jury could consider in passing on the credibility of the witnesses and in determining whether Coats had withdrawn from the August 22, 1951, written agreement, but they do not require a finding that he did not do so. As we have indicated above, they are not inconsistent with a withdrawal by Coats from the contract. For instance, the written statement of account prepared by Wyman Windham, showing a purchase price of $310,000 for the timber and a total profit of only $7,142.50 was obviously incorrect. Windham testified that the statement was given not for the purpose of misleading Mr. Coats, because Coats knew that a man named Hart living at Jasper was threatening to sue for a commission on the sale of the timber, and Windham was attempting to make Hart believe that the profit was small. Appellees say that it is evident from the statement that it was not intended to mislead Coats because it states that the commission to Coleman was $2,000 while Coats had signed with Windham a note or an agreement to pay Coleman a commission of $15,000. Also, another incident illustrating a conflict in the evidence before the jury was this. Other parties testified that in the office of Mr. McClain in Conroe, while McClain was dictating a letter for Coleman to write to Sonnier, Coats was asked about his part in the transaction and he stated "I am out of the deal". Coats testified that this was incorrect because when they asked him about it he said "I am out of the deed."

All of these matters presented a fact question for the jury to decide and we believe that the evidence amply supports the jury's finding that Coats had abandoned the contract. The evidence is not inconsistent with such abandonment but in our opinion is consistent with his abandonment of the agreement to purchase as well as sell this timber. The appellants' Points 1 to 6, inclusive, and 13 to 16, inclusive, are overruled.

■ By their 7th and 8th points the appellants say that the trial court erred in overruling their motion for new trial because (1) the jury reached its verdict as a result of conspiracy to deprive them of a fair and impartial trial; (2) appellants were deprived of trial by a fair and impartial jury. Under these points the appellants charge the conspiracy but make no proof of such a condition or an act. They say that the jury commissioners and the members of the jury panel which were called for jury service the week when this case was to be called for trial were all intimate friends of the appellees and were either business associates, fellow church members of the appellees, one or all of them. They say that for the week of May 10, 1954, the jury commissioners selected 40 men, 31 of whom were from Livingston, the county seat, and 9 from elsewhere in Polk County. Of those who reported for jury service, 91 percent were from Livingston. Wyman Windham and his two sons had been prominent in business in Livingston for many years. Appellee Murphy had been district judge and county judge in that county for many years before his retirement. Thirty-one of the 40 jurors for that week were from Livingston. Of these 8 were pallbearers at Mr. Wyman Windham's funeral and 7 belonged to the same church and served on the Board of Stewards with Wyman Windham and his sons. One

of the commissioners was a director in the bank in which Mr. Windham's two sons were stockholders. The appellants say that the case was tried to a stacked jury and that everything in the record points to the conclusion that they were victimized by a tacit conspiracy made operative through the use of a jury composed of men both disqualified and incompetent.

An extensive hearing was had by the court on appellants' motion for new trial and a large volume of testimony was heard. The trial judge heard the testimony and made certain fact findings when he overruled their motion for new trial.

■ The record shows that all of the prospective jurors on the jury list submitted to counsel were given an extensive examination individually on the examination on their voir dire. Practically all of them were brought in as witnesses and testified on the motion for new trial, also. We have found no instance in which any member of the panel withheld any information from counsel in answer to questions asked him concerning his qualification as a juror in this case. It was shown that Polk County and Livingston, its county seat, are not heavily populated and both the Coats family and the Windham family have lived in Livingston for a long time and are well known both in the town and in the county. Senator V. A. Collins, one of the attorneys for the appellants, has lived in Livingston and has been active in the practice of law and in public affairs for more than 20 years. A great many of the jurors knew the parties and the attorneys on both sides of the case. The appellants failed to show that any juror on his voir dire examination was asked the question whether he had any bias or prejudice in favor of or against either of the parties to the litigation. There is nothing to show that counsel as well as the appellants did not know that some of the jurors were members of the same church of which the Windhams were members, or that they did not know that some of the jurors were either active or honorary pallbearers at the funeral of Mr. Wyman Windham. Likewise on the motion for new trial there was no evidence to show that any juror

selected had any bias or prejudice for or against either of the parties. In Swartout v. Holt, Tex.Civ.App., 272 S.W.2d 756, the court discusses the question of what must be shown in order to require that a new trial be granted in similar circumstances. The court points out that under Rule 327, Texas Rules of Civil Procedure, it was intended to give some discretionary powers to the trial court in granting or overruling a motion for new trial. If a question of fact was presented it was the duty of the trial court to make a finding thereon and this he has done by overruling the motion for new trial. The court also points out that under our procedure the court and attorneys for the parties under the direction of the court may interrogate the members of the jury panel for the purpose of estimating their fitness for jury service and our trial courts are very liberal in permitting inquiry of the panel on voir dire examination. In the trial of a civil case the voir dire examination of the parties may be waived.

The appellants in this case made no inquiry of the jury panel as to whether any of them had a bias or prejudice for or against either of the parties. They had no objection to the qualifications of any of the jurors until after the verdict was returned and made no charge of conspiracy or bias or prejudiced jurors until the filing of their amended motion for new trial. As we held in Liberty Cab Co. v. Green, Tex.Civ.App., 262 S.W.2d 522, it was not error for the trial court to overrule a motion for new trial when there was no showing that the jurors had withheld information from counsel in answering questions on their voir dire. We think the trial court was correct in his holding that the charges made by appellants as to the formation of this jury were unsupported by the evidence and these points are overruled.

By their 9th, 10th, 11th, and 12th points appellants say that the trial court erred in overruling their motion for new trial because the jury commission which selected the jurors for the trial of this case was not a lawfully constituted body, because they acted in complete disregard of the statutes

controlling such acts, that such jury commission was never lawfully created and that the jury which tried the case was therefore unlawfully constituted and the verdict was void and of no force and effect. Under these points they contend that the jury commission was improperly selected because there was no order of the district judge appointing said commission, the jury commissioners were not residents of different parts of the county, and members of the commission separated at various times before they completed their duty of drawing the jury panel.

■ The district clerk testified that the following order was included in the Criminal Minutes of his office: "State of Texas. County of Polk. On this 16th day of April, 1954, came into open court, Lester Armitage, B. A. Glover, Henry Williams and B. C. Lively, Jr., and were duly tried, selected and sworn and charged by the court to serve as Jury Commissioners to select and draw the Grand Jury and Petit Jurors to serve at the Special Ninth District Court for the May term, 1954, and afterwards the Jury Commission returned into open court a list of Grand Jurors and Petit Jurors selected and drawn by them to serve as Grand and Petit Jurors for the May term, A.D. 1954, and the Jury Commissioners were afterwards by the Court dismissed." The sheriff summoned the Commissioners named in the above order to act as jury commissioners for the May term of court in April, 1954. The names of the commissioners were given to him by the District Clerk. Some of the men appeared on the 16th and some did not, but all of them appeared on April 19th at which time the district judge swore them in and gave them their instructions. The District Clerk also testified that all of the instructions and orders were dated for April 16th and were not changed when all the members of the commission appeared and were sworn in on April 19th. All of the list of the jurors stated that they were drawn April 16th. From these facts the appellants say that it appears that the jurors had been selected for the commissioners

and that was one reason why only two appeared on April 16th; that they separated and some went fishing on April 17th; that one of the commissioners ate lunch every day in the home of his son-in-law in Livingston who eventually served as a juror in this case. We regard this as a highly speculative conclusion, not supported by the evidence. The members of the jury commission were examined in detail by counsel on the hearing on motion for new trial. None of the evidence by any of them, nor by any other witness from any other source disclosed that the jury commissioners acted improperly or with any evil intent to favor anybody in any lawsuit then pending in the courts of Polk County. The trial court so found. The discrepancies in dates of April 16th and April 19th are explained by the testimony of the district clerk. The statute does not require that the order appointing jury commissioners shall be in writing. The order in the Criminal Minutes of the court showed that these four men were duly tried, selected and sworn to serve as jury commissioners. The same district judge who made the appointment of the commissioners presided at the trial, heard the testimony on the motion for new trial and overruled the motion for new trial. In doing so he, by implication, found that these men were regularly appointed by him and that they had done nothing upon which a conclusion could be drawn that they were acting illegally and with the intention to draw as jurors men who would favor either side in a case pending or to be tried in his court.

■ On the authority of Jones v. State, 219 S.W.2d 463, by the Court of Criminal Appeals, it is held that the provision of the statute, Vernon's Ann.Civ.St. art. 2104, requiring that jury commissioners reside in different sections of the county is directory and not mandatory. Also on the authority of another decision by the Court of Criminal Appeals in Smithwick v. State, 155 Tex.Cr.R. 292, 234 S.W.2d 237, the statute requiring that the commissioners not separate was merely directory and not mandatory. Vernon's Ann.Civ.St. art. 2107. It

was for the trial judge to decide whether from the circumstances of this case their separation would serve to nullify their work in the selection of jurors, and he decided against the appellants.

Again it is noted that no complaint of the organization, selection and the actual selection of the jurors by the commission was made by the appellants prior to the actual trial of the case, during the selection of jurors, or at any time during the trial, until after the verdict and judgment had been entered. The appellants made this complaint in their amended motion for new trial.

 We have reviewed all of the evidence adduced on the hearing for motion for new trial and find nothing there which would warrant us in holding that the trial judge erred in holding that nothing was proved by the appellants to show that either the jury commission or the jury itself was actuated by improper motives, or in carrying out a tacit conspiracy against the appellants.

A portion of the argument of the appellants, under these points in their complaints against the jury commissioners, and also in their argument in support of their attacks upon the jury itself, begins with the premise that the verdict of the jury was so strongly against the great weight and preponderance of the evidence that such a verdict could only have been rendered against them by a jury that was actuated by bias and prejudice in favor of the Windhams and E. T. Murphy; that only a corruptly formed and actuated jury could have rendered such a verdict. They then bring forward the facts outlined concerning the organization of the jury commission and the close ties of friendship, business and religious association with the appellees as proof of the corruptness of such jury and commission formation. As we have held that the verdict of the jury is not against the great weight and preponderance of the evidence, but is in accordance with the evidence, the argument of the appellants is not sound. It is not only not supported by evidence of a conspiracy,

tacit or otherwise, but it proceeds from a premise which is likewise unfounded by the evidence.

No error is shown in the action of the trial court in overruling the motion for a new trial and the judgment is affirmed.